OPINION OF THE COURT
Gabrielli, J.
We hold that a municipality may, under certain circumstances, treat a cash deposit accompanied by a suitable indemnity agreement as satisfying a requirement in a bid specification that the successful bidder furnish a “performance bond”. In so holding, we note that a bid specification calling for a “performance bond” does not necessarily require the involvement of a third-party surety.
In the latter half of 1978, respondent, the Town Board of Newfane, advertised for bids for a refuse collection contract to cover a three-year period of time. Among the stated bid specifications was the following requirement: “BID SECURITY AND PERFORMANCE BOND * * * The successful bidder shall furnish a performance bond in an amount equal to fifty (50%) percent of the amount of the bid for the first year of the contract”.
Four bids were submitted, including those of petitioner, Cataract Disposal, Inc., and respondents, J & I Disposal, Inc., and Country Side Disposal, Inc. The lowest bid was submitted by respondent J & I Disposal (J & I), but that contractor was unable to furnish a surety bond “in an amount equal to fifty (50%) percent of the amount of the bid for the first year of the contract”, apparently because surety companies in the area were generally unwilling to guarantee performance of this type of contract.[1] Instead, J & I included in its bid an offer to deposit an equal amount *270 in cash with the town to insure its faithful performance. In addition, J & I offered to execute an agreement authorizing the town to appropriate the cash collateral “to indemnify itself against' any loss actually incurred by reason of any loss or damage directly arising by reason of the failure of the [contractor] to faithfully perform its * * * contract”.
The town board found this offer satisfactory and awarded the contract to J & I. Petitioner Cataract Disposal, Inc. (Cataract), which was the only bidder to offer a surety bond,[2] then commenced the present proceeding in an effort to have the bid award set aside. It was Cataract’s position that the town board acted improperly in “waiving” the requirement of a “performance bond” and accepting a cash deposit as a substitute, since a “performance bond” had been expressly required in the bid specifications.
Following submission of proof by each of the parties, Special Term denied the requested relief, holding that the town’s acceptance of a cash deposit from J & I did not constitute a material departure from the advertised bid specifications. The Appellate Division, however, reversed on the ground that the language in the town’s advertisement for bids did not place potential bidders on notice that a cash deposit would be an acceptable form of security. While the Appellate Division majority recognized that a cash deposit could satisfy the statutory requirement that a municipality obtain some form of security to insure faithful performance (General Municipal Law, § 103, subd 1), it reasoned that once the municipality solicits a “performance bond” it must adhere to that specification in order to “guard against favoritism, extravagance and corruption”. Accordingly, the court held that the decision of the town to accept J & I’s cash deposit in place of a “performance bond” furnished by a third-party surety should be set aside. We conclude, however, that the Appellate Division was in error and, consequently, we hold that the decision of that court should be reversed.
*271 At the outset, we note our disagreement with the assumption, made by both the Appellate Division majority and the dissenters in our court, that the town board was not entitled to consider the cash deposit supplied by J & I Disposal to be a “performance bond” as that term was used in the town’s advertisement for bids. This assumption rests upon the fallacious premise that a “performance bond” necessarily entails an agreement by a third-party surety to insure the successful bidder’s faithful performance of the contract.
The term “performance bond” is defined in Black’s Law Dictionary as a “[b]ond which guarantees * * * against breach of contract” (5th ed, at p 1024; see Isaac v Reliance Ins. Co., 201 Kan 288). Simply put, a “performance bond” is merely an undertaking “given to insure the public authority that the contract once awarded [will] be completed as awarded” (Extruder Louver Corp. v McNulty, 34 Misc 2d 566, 569). We know of no rule of law which confines this concept of insurance against breach to an undertaking posted by a third-party surety or which would exclude from the concept a cash deposit submitted by the bidder against which the contracting public authority has a right of direct recourse. Indeed, a deposit of cash together with an indemnity agreement, when placed in the hands of the contracting municipality, may be viewed as the functional equivalent of a third-party surety, since both simply provide a reliable source of recovery in the event of the contractor’s default or insolvency.
This is not to suggest that a municipality has no choice in all cases but to accept an offer of a cash deposit as security for the faithful performance of a public works contract. To the contrary, we merely hold that when the bidding specifications call for a “performance bond”, it lies within the province of the contracting municipality to consider the requirement to have been met when the bidder offers to post a cash deposit and an indemnity agreement permitting the municipality to appropriate the collateral directly in the event of a breach.
We note that even if we were to adopt the rule advocated by petitioner that a third-party surety is required to satisfy a bid specification calling for a “performance bond”, we *272 could not conclude that the town in this case acted improperly in awarding the refuse disposal contract to respondent J & I, since the substitution of a cash deposit and indemnity agreement would not have represented a material departure from the bid specifications. A minor variation from the terms of an advertisement for bids should be considered material only when it would impair the interests of the contracting public authority or place some of the bidders at a competitive disadvantage (Le Cesse Bros. Contr. v Town Bd. of Williamson, 62 AD2d 28, affd 46 NY2d 960). Neither condition is present here.
The Town of Newfane, which now holds the cash deposit posted by J & I, is certainly in no worse position than it would have been had J & I posted a third-party surety bond. Indeed, it may actually be in a somewhat better position, since the terms of the “collateralized indemnity” agreement permit it to appropriate the deposit directly in the event of a default in performance and thereby eliminates the need for making a demand on a surety for payment with the attendant risk of litigation (see 33 Opns St Comp, 1977, p 55).
Moreover, there is no indication on the present record that the town’s decision to permit J & I to post a cash deposit placed the other bidders at a competitive disadvantage. Indeed, there was undisputed proof in this case that the cash deposit submitted by J & I actually cost that contractor more than an equivalent third-party surety bond would have cost. Thus, contrary to the assertions of the dissenters, it is simply inaccurate to say that the use of a cash deposit by J & I enabled the contractor to submit a lower bid than that submitted by petitioner Cataract.[3] As for the suggestion that the other bidders may have been discouraged from submitting bids by the town’s insistence upon a “performance bond”, it should suifice to point out that the town merely indicated to potential bidders that it was unwilling to accede to their request that the requirement be dropped entirely. There was nothing in the town’s specifications, however, which would have led potential bidders to assume *273 that only a bond supplied by a licensed surety company would satisfy the requirement for financial security.
Our discussion would be incomplete if we failed to address ourselves to some of the comments made in the dissenting opinion. The dissenters suggest that a bond supplied by a third-party surety carries with it certain advantages that are not present when the contractor merely posts a cash deposit. Specifically, the dissenters argue that in situations where a surety bond has been posted, it is the surety and not the contracting public authority which is “faced with the difficulty of obtaining a reliable susbtitute * * * contractor on short notice” in the event of a default (at p 275). This contention, however, must be rejected, since it is based upon an unjustified assumption that surety companies generally undertake the absolute obligation of furnishing substitute performance. In fact, sample clauses providing for completion of the contract work by the surety generally give the surety the option of either procuring substitute performance or reimbursing the assured for its expenses in securing completion of the work following a default in performance by the contractor (see Am Jur Legal Forms 2d, Contractors’ Bonds, §§ 67:161-67:162). Thus, the municipality which accepts a surety bond as security is not necessarily protected against the sometimes arduous task of locating a new contractor to complete the work. Moreover, far from being placed in an advantageous position, the municipality which accepts a surety bond may well find itself in the undesirable position of having to accept the surety’s choice of substitute contractors even though it might prefer to select its own contractor and then be reimbursed by the surety.
The dissenters’ additional argument in favor of surety bonds is similarly without merit. The dissenters contend that a surety bond is to be preferred over a cash deposit because it enables the contracting authority to assume, without substantial investigation on its own, that any contractor obtaining such a bond has demonstrated financial stability. A municipality, however, may not avoid its statutory duty to satisfy itself as to the contractor’s financial responsibility by simply delegating the task of investigating the contractor to a private surety company (see General *274 Municipal Law § 103, subd 1). Thus, the argument advanced by the dissenters cannot be accepted.
However much the dissenters might prefer a surety bond to other forms of financial security, the choice of what type of security to demand ultimately rests with the contracting public authority. Although a public authority may not award a contract without insisting upon some reasonable form of security, it generally has considerable latitude in defining the terms under which such security must be offered. Thus, if a municipality considers the presence of a third-party surety to be an important safeguard, it may ensure protection for itself by drafting its bid specifications accordingly. The fact remains, however, that in this case the contracting agency chose to require only a “performance bond” and did not feel a need to make a more specific request for a performance bond supplied by a surety. We cannot and should not attempt to “second guess” the wisdom of this legislative decision by the town.
Finally, the dissenters expressed concern about, the danger of favoritism and the potential for venality is completely unwarranted in the present case. Respondent J & I submitted the lowest bid for the three-year refuse disposal contract and no question was raised about the firm’s financial responsibility or ability to perform the contract in accordance with its terms. Under such circumstances, it cannot be said that there was anything sinister or even improper in the town’s decision to award the contract to J & I.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the petition dismissed.

. According to the uncontroverted allegations in J & I’s affidavit before the court, that firm had “contacted a number of insurance companies in an effort to secure a performance bond for posting as security * * * and [was] advised that no insurance companies issuing performance bonds in the Western New York area will issue a performance bond covering the performance of garbage disposal contracts”. The accuracy of this statement was apparently borne out by the complaints made by other contractors at a public meeting that they were unable to obtain performance bonds from the licensed insurance companies in the area.

. According to respondent J & I’s affidavit, Cataract, which submitted the third lowest bid, was able to have performance bonds written on its account by an insurance company with a New York City office “because of its relationship to a parent corporation or other similar entity”. This allegation was not disputed by Cataract.

. It should be noted that the amount of petitioner’s bid exceeded that of respondent J & I by more than the cost of a surety bond.