SCE Envtl. Group, Inc. v Murnane Bldg. Contrs., Inc. (2025 NY Slip Op 05997)

SCE Envtl. Group, Inc. v Murnane Bldg. Contrs., Inc.

2025 NY Slip Op 05997

Decided on October 30, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:October 30, 2025

CV-24-0020
[*1]SCE Environmental Group, Inc., Plaintiff,
v
Murnane Building Contractors, Inc., et al., Defendants and Third-Party Plaintiffs-Respondents; Classic Environmental, Inc., Third-Party Defendant-Appellant. (Action No. 1.) (And Another Related Action.)
Classic Environmental, Inc., Appellant,
v
Murnane Building Contractors, Inc., et al., Respondents. (Action No. 3.)

Calendar Date:September 9, 2025

Before:Garry, P.J., Aarons, Fisher, McShan and Mackey, JJ.

Byrne, Costello & Pickard, PC, Syracuse (Jordan R. Pavlus of counsel), for appellant.
Hinckley Allen & Snyder, LLP, Albany (Jeremy M. Smith of counsel), for Murnane Building Contractors, Inc. and others, respondents.
Dreifuss Bonacci & Parker, PC, Florham Park, New Jersey (Paul H. Mandal of counsel), for Travelers Casualty and Surety Company of America, respondent.

McShan, J.
Appeal from an order of the Supreme Court (Richard Platkin, J.), entered December 5, 2023 in Albany County, which, among other things, (1) in action No. 1, denied third-party defendant's motion for summary judgment dismissing the third-party complaint, and (2) in action No. 3, granted defendants' motion for summary judgment dismissing the complaint.
In 2016, defendant Murnane Building Contractors, Inc. (hereinafter MBC) was awarded a contract with the Office of General Services (hereinafter OGS) to perform certain renovations and hazardous material abatement on a state office building in the City of Albany (hereinafter the project). In connection with that contract, defendant Travelers Casualty and Surety Company of America issued both a payment bond and a performance bond covering MBC's obligation under the project. MBC was designated as the prime contractor pursuant to its agreement with OGS, and MBC subcontracted with other entities for, as relevant here, asbestos abatement in the building. MBC first subcontracted with SCE Environmental Group, Inc. to engage in asbestos abatement in the building. However, SCE was later terminated in August 2017 and, after briefly utilizing an interim contractor, MBC subcontracted with Classic Environmental, Inc. in September 2017 to continue the abatement work. On October 24, 2017, Classic utilized a power washer while engaged in its asbestos abatement work on a beam in the building that was covered in lead-based paint. The resulting water runoff caused significant lead contamination in the surrounding area and infiltrated a local storm water drainage system (hereinafter the lead incident). In November 2017, OGS terminated MBC's prime contract for cause due to, among other things, a failure to ensure a timely and competent completion of the asbestos abatement work — specifically referencing the lead incident caused by Classic. MBC then informed Classic to cease all work on the project. After MBC's contract was terminated, Travelers entered into a takeover agreement with OGS in accordance with its surety obligations and the original agreement between OGS and MBC. Classic later submitted a claim against the bond posted by Travelers for certain amounts that Classic believed it was owed by MBC, and Travelers denied the claim.
SCE thereafter commenced action No. 1 against both MBC and Travelers, asserting, among other things, a breach of its subcontract with MBC. As part of that proceeding, MBC and Travelers commenced a third-party action against Classic for breach of contract, contractual indemnification and common-law indemnification, alleging that the termination of its prime contract was due to Classic's conduct. Classic later commenced action No. 3 against MBC, Travelers and two individuals associated with MBC (hereinafter collectively referred to as the MBC defendants) asserting, among other things, claims for breach of contract and account stated, and claims against Travelers seeking recovery against the payment [*2]bond it had issued. Both Classic and the MBC defendants answered the respective complaints, and, upon the MBC defendants' motion, the matters were joined for the purposes of discovery. The MBC defendants then moved for, among other things, partial summary judgment as to liability on MBC and Travelers' breach of contract claim in their third-party complaint in action No. 1 and summary judgment dismissing Classic's complaint in action No. 3.[FN1] Classic opposed the MBC defendants' motion and cross-moved for summary judgment dismissing all damages sought by MBC and Travelers, raising two separate bases for relief. First, Classic contended that the affirmative statements and positions taken by MBC and Travelers in an action against OGS that was pending in the Court of Claims were contrary to those taken in action No. 1 and should therefore be foreclosed by the doctrine of judicial estoppel. Second, Classic asserted that Travelers' undertaking of the completion of the project pursuant to its performance bond foreclosed it from seeking damages from Classic.
In a consolidated decision and order, Supreme Court, among other things, partially granted the MBC defendants' motion and denied Classic's motion in its entirety. As relevant here, with respect to the MBC defendants' motion, Supreme Court determined that they had met their burden to establish that Classic breached the subcontract agreement by causing lead-contaminated water to leave the project site and infiltrate a local storm drain. The court further concluded that Classic failed to raise a material issue of fact regarding the breach of contract claim based upon that incident and, as a result, Classic was precluded from seeking damages against MBC under the agreement in action No. 3. Supreme Court also dismissed Classic's second cause of action that purported to seek damages for services rendered pursuant to the contract and its cause of action for an account stated. Finally, Supreme Court dismissed Classic's cause of action against Travelers against the payment bond, noting "the absence of a viable claim of recovery against MBC." Regarding Classic's motion, Supreme Court refused to dismiss the damages sought by MBC or Travelers or to preclude them from taking potentially inconsistent positions from those asserted in the Court of Claims. Supreme Court further denied Classic's motion for partial summary judgment asserting that Travelers had voluntarily assumed the obligation to complete the project. Classic appeals.
We affirm. Turning first to the MBC defendants' motion, Classic contends that Supreme Court improperly resolved various issues of fact with respect to whether it had materially breached its contract with MBC. "A material breach is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract" (Feldmann v Scepter Group, Pte. Ltd., 185 AD3d 449, 450 [1st Dept 2020] [internal quotation marks and citations [*3]omitted]; see U.W. Marx, Inc. v Koko Contr., Inc., 124 AD3d 1121, 1122-1123 [3d Dept 2015], lv denied 25 NY3d 904 [2015]). "A material breach of a contract excuses the nonbreaching party's performance and precludes the breaching party from bringing a claim under the contract" (EXRP 14 Holdings LLC v LS-14 Ave LLC, 228 AD3d 498, 499 [1st Dept 2024] [citations omitted]; see U.W. Marx, Inc. v Koko Contr., Inc., 124 AD3d at 1122).
In support of their motion, the MBC defendants tendered the subcontract between MBC and Classic, which, in pertinent part, specified that "[Classic] shall comply with all applicable laws, ordinances, rules, regulations and orders of any public authority having jurisdiction over the [p]roject" and that Classic would be in default if, among other things, it "violate[d] any laws, ordinances, rules, regulations or orders of any public authority having jurisdiction." The MBC defendants further submitted two deficiency notices that OGS had issued to Classic within the first month that it had commenced work in the building. Both notices cited Classic for utilizing a power washer during "gross removal of spray on fireproofing" that was in "direct violation of [a] code rule." The second notice of deficiency indicated that Classic's supervisor was in violation of written and verbal directives from OGS and directed that pressure washers be removed from the work area and brought in only during final cleaning.
In his deposition, Thomas Perrault, Classic's vice president and part owner, acknowledged that on October 24, 2017, Classic employees were attempting to remove a mastic from steel beams on the third floor of the building using a pressure washer. The affidavit of James Hogel, MBC's former vice president, states that the use of that pressure washer on those beams stripped away orange paint that contained lead, a condition that Classic was aware of. According to a notice of deficiency issued to Classic in the immediate aftermath of the lead incident, orange-tinted water was observed coming from Classic's hoses that it was utilizing to remove water runoff from its work area on the third floor. MBC submitted deposition testimony from Classic's expert, who acknowledged that Classic had contributed to the lead contamination through the use of the pressure washer because the water discharge had breached containment. Department of Environmental Conservation (hereinafter DEC) became involved at the behest of OGS and, in response to Classic advising that they were utilizing the proper filtering system for the water, questioned why Classic was discharging into a storm water drain in the first place, as it did not possess a proper environmental permit. As indicated in the notice, Classic was directed to stop pumping filtered water on site and MBC ultimately retained a different contractor to clean up the contamination under DEC and Department of Labor supervision. As a result of the lead incident, DEC issued notices of violation to Classic, which [*4]Perrault confirmed were "settled without liability" by payment of a fine.
The day after the lead incident, MBC wrote to Classic, reminding that Classic was "required to comply with all safety standards, applicable laws, ordinances, rules, regulations and orders of any public authority having jurisdiction over the [p]roject." That same day, OGS decided to remove 15 Classic employees from the project, including a supervisor. Three days later, MBC directed Classic to cease all asbestos operations and "take corrective actions to prevent further spreading of potential lead contamination." That communication was prompted by OGS advising MBC that test results had confirmed the presence of lead-contaminated water throughout the third floor of the building. Perrault responded to MBC, confirming that Classic was in receipt of the stop work order and acknowledging that it had observed the orange-tinted water while removing mastic on the steel surfaces causing paint to be impacted. Perrault explained that water generated during the removal process was being discharged through a filter that had apparently failed during that process. Perrault also indicated that it was continuing removal of potentially impacted soil near the area where orange-tinted water was discharged outside. On October 29, 2017, OGS wrote to MBC, advising that it was still reviewing the lead incident and assessing the extent of lead contamination on the third floor and that work was paused for at least two days.
On November 2, 2017, OGS again wrote to MBC, advising that the lead testing results from within the building indicated that MBC's efforts to prevent further spread of the lead contamination had been unsuccessful and that MBC would be required to "retain a competent professional to advise [MBC] and develop a comprehensive plan on appropriate remediation actions to alleviate the lead contamination created by" Classic. Five days later, OGS advised MBC in correspondence that Classic "does not fully understand they are responsible for this problem that was completely avoidable" and that "the orange water discharge issue was a direct result of improper procedures that were shut down earlier in the day, and the discharge of the material into the storm drain system without the required permit . . . is not permissible." On November 13, 2017, OGS terminated the prime contract with MBC, noting various factors, including scheduling delays, problems with Classic "performing improper procedures for cleaning and waste-out," and the lead incident, which resulted from Classic "improperly pressure-washing beams on the third floor and allowing known lead-contaminated orange paint to wash off, and following inadequate and unapproved filtering procedures" that "allowed the contaminated water to enter outside storm drains," prompting DEC and Department of Labor involvement. OGS further noted that the resulting lead contamination caused the project to be further delayed in order to engage in lead abatement[*5]. We agree with Supreme Court that such proof was sufficient to establish that Classic had materially breached the subcontract by causing the lead incident, thus shifting the burden to Classic to submit proof that would establish the existence of a triable issue of fact (see Yeshiva Gedolah Zichron Moshe v Church Mut. Ins. Co., 233 AD3d 1220, 1222 [3d Dept 2024]; Davis v Marshall & Sterling, Inc., 217 AD3d 1073, 1074 [3d Dept 2023], appeal dismissed 40 NY3d 1084 [2024]).
Classic's primary contention is that there was not a material breach of the subcontract because OGS had improperly characterized the severity of the lead incident based upon its longstanding ulterior motive to terminate MBC from the project.[FN2] In support of that position, Classic points to various correspondence and excerpts establishing that OGS had indicated its dissatisfaction with MBC's progress on the project at multiple stages after its inception, including several correspondence in January and February 2017 advising MBC that it was not progressing on the project in accordance with the time frames provided in the prime contract. A pre-default meeting between OGS and MBC, based in part on delays to asbestos abatement, was held in March 2017 and a "Show Cause/Responsibility Meeting" was held two days after Classic was retained on the project and continued on October 23, 2017, one day prior to the lead incident. OGS's alleged motivation to terminate MBC is only tangentially related to whether Classic had engaged in conduct that materially breached the subcontract. In that respect, even if OGS had not terminated MBC, Classic could still be found in material breach of the subcontract if it engaged in conduct that defeated the essential purpose of the contract.[FN3] The termination of the prime contract, and Classic's role in it, is relevant to the measure of damages, which remains pending. Moreover, the chief indication in the record that Classic relies upon is a brief reference provided in a responsibility hearing that occurred several months later for a different project that Classic sought to work on. The brief statement from OGS within the meeting minutes of the responsibility hearing indicates that the cleanup from the lead incident was not resolved until "a few days later," and was provided in response to Classic's position that the lead contamination had been cleaned up in one day. Even viewed in the light most favorable to Classic, stating that cleanup from the lead incident took "a few days" is not contradictory, nor a repudiation, of OGS' characterization of the lead incident, precipitated by Classic's "careless procedures and repeated infractions" of various regulations, as "catastrophic."[FN4] The record establishes that the lead incident caused substantial delay to the project owing to the need to pause all asbestos-related remediation in order to engage in lead remediation, and the severity and magnitude were indicated in all of OGS's correspondence in its immediate aftermath[*6], which detailed the significant lead contamination both in and outside of the building.
In short, Classic's suggestion that there is a material issue of fact as to OGS's motivation to terminate MBC and the remote connection to the materiality of the breach of the subcontract is based upon nothing more than speculation (see Nellenback v Madison County, ___ NY3d ___, ___, 2025 NY Slip Op 02263, *3 [2025]; Espinal v Trezechahn 1065 Ave. of the Ams., LLC, 94 AD3d 611, 613 [1st Dept 2012]; Thomas Novelli Contr. Corp. v P & T Contr. Corp., 7 Misc 3d 127[A], 2005 NY Slip Op 50447[U], *1 [App Term, 2d Dept, 2nd & 11th Jud Dists 2005]) and is contrary to its own concession that the lead incident was "the straw that broke the camel's back." Even if MBC was on the verge of termination as posited by Classic, the lead incident ultimately contributed to that result and the conduct engaged in by Classic was in breach of the clear language in the subcontract. Accordingly, we agree with Supreme Court's determination that Classic did not meet its shifted burden, and that summary judgment was appropriate with respect to the MBC defendants' claim for breach of contract based upon a material breach (see GRJH, Inc. v 3680 Props., Inc., 179 AD3d 1177, 1179 [3d Dept 2020]; Wm. Schutt & Assoc. Eng'g & Land Surveying P.C. v St. Bonaventure Univ., 151 AD3d 1634, 1635 [4th Dept 2017], amended on rearg 153 AD3d 1676 [4th Dept 2017]; George S. May Intl. Co. v Thirsty Moose, Inc., 19 AD3d 721, 722 [3d Dept 2005]). Consequently, Supreme Court also properly dismissed Classic's breach of contract claim in action No. 3, as Classic's material breach excused performance by MBC under the subcontract (see EXRP 14 Holdings LLC v LS-14 Ave LLC, 228 AD3d at 499; U.W. Marx, Inc. v Koko Contr., Inc., 124 AD3d at 1122; see also Restatement [Second] of Contracts § 241 [1981], Comment a, Illustration 1).[FN5]
We reach a similar result with respect to Classic's cause of action for an account stated. "[A]n account stated . . . is an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due, and may be implied from the retention of an account rendered for an unreasonable period of time without objection and from the surrounding circumstances" (Solartech Renewables, LLC v Techcity Props., Inc., 167 AD3d 1316, 1318 [3d Dept 2018] [internal quotation marks and citations omitted], lv dismissed 33 NY3d 1054 [2019]; see Levine v Harriton & Furrer, LLP, 92 AD3d 1176, 1178 [3d Dept 2012]). Essential to a claim for an account stated is an agreement between the parties with respect to the amount due (see Walter Boss, Inc. v Roncalli Frgt. Co., Inc., 210 AD3d 1124, 1128 [2d Dept 2022]; Raytone Plumbing Specialities, Inc. v Sano Constr. Corp., 92 AD3d 855, 856 [2d Dept 2012]; Erdman Anthony & Assoc. v Barkstrom, 298 AD2d 981, 981-982 [4th Dept 2002]).
Classic's cause of action sought payment for two payment applications[*7], one that was submitted to MBC after the lead incident and the second that was purportedly submitted to MBC after the prime contract was terminated. The first three payment applications were submitted by Classic in accordance with the contract and paid promptly, the third of which was paid two days after the occurrence of the lead incident. On October 27, 2017, MBC advised Classic to cease any abatement work and to take corrective action with respect to the lead contamination that had occurred. MBC was subsequently terminated from the project on November 13, 2017. After that point, OGS rejected further payment applications from MBC, including those submitted for reimbursement that were predicated in part on work identified in Classic's payment application No. 3. According to Hogel, he had spoken to Perrault in the week after October 31, 2017, when Classic submitted payment application No. 4, and advised Perrault that no payment would be forthcoming based upon Classic's unsatisfactory work. Hogel also stated that he did not receive payment application No. 5 and was not even aware of it until learning of Classic's submission of the application to Travelers.
We have already determined that the MBC defendants' submissions establish Classic's material breach of the subcontract relieving MBC from any further obligations pursuant to that agreement (see Bison Capital Corp. v Hunton & Williams LLP, 238 AD3d 505, 506 [1st Dept 2025]; Innerworkings, Inc. v Arik Eshel CPO & Assoc. P.C., 224 AD3d 590, 592 [1st Dept 2024]). Further, the payment provisions of the subcontract permitted MBC to withhold payments to protect it from loss based upon defective work or damage to the property caused by acts or neglect by Classic (see Sabre Intl. Sec., Ltd. v Vulcan Capital Mgt., Inc., 95 AD3d 434, 438 [1st Dept 2012]; Enviroclean Servs., LLC v CEM, Inc., 12 AD3d 1042, 1043-1044 [4th Dept 2004]). In any event, we agree with Supreme Court that Classic's submissions properly established that there was no implied agreement arising from Classic's submission of the prior payment applications, as the two later applications were dated after Classic had been advised that its work was deficient and that no further payment was forthcoming. Classic's submission in opposition fails to identify a triable issue with respect to these facts and, therefore, the cause of action for an account stated was properly dismissed (see M & A Constr. Corp. v McTague, 21 AD3d 610, 611-612 [3d Dept 2005]; see also TM 18 Realty, LLC v Copper Wang, Inc., 222 AD3d 904, 905 [2d Dept 2023]).[FN6]
In light of our determination, we are also in accord with Supreme Court's dismissal of Classic's cause of action against Travelers with respect to the payment bond. In an action to secure payment on a bond and relevant subcontract, the surety is entitled to assert any defense available to the principal on the subcontract (see Clayton B. Obersheimer, Inc. v Travelers Cas. & Sur. Co. of Am., 96 AD3d 1284, 1285 n 2 [3d [*8]Dept 2012]; Brownwell Steel, Inc. v Great Am. Ins. Co., 28 AD3d 842, 843 [3d Dept 2006]). As Classic's causes of action against the MBC defendants were properly dismissed, it is foreclosed from seeking relief from Travelers on the payment bond.
Similarly, as it concerns Classic's motion, we find no merit to its contention that Travelers voluntarily assumed its performance obligations thereby precluding it from seeking any damages against Classic. Classic posits that Travelers was not obligated to perform pursuant to the performance bond because OGS improperly terminated the prime contract with MBC, which reflects the position of MBC and Travelers in the Court of Claims action. However, notwithstanding the fact that resolution of any issue related to the termination of the prime contract remains pending, the position advanced by Classic is contrary to the well-established obligations of a surety, in this case Travelers, on a performance bond. "A performance bond is an undertaking by the surety to be financially responsible to the owner if the surety's principal (i.e., [MBC]) does not faithfully perform all of its obligations under the contract. Where its principal is properly terminated for default or is otherwise in default, a surety has the option of either completing the project itself (through a contractor retained by the surety) or paying the owner its damages" (WBP Cent. Assoc., LLC v DeCola, 91 AD3d 861, 862-863 [2d Dept 2012] [internal quotation marks and citation omitted]; see Matter of Cataract Disposal v Town Bd. of Town of Newfane, 53 NY2d 266, 271 [1981]; U.W. Marx, Inc. v Mountbatten Sur. Co., 3 AD3d 688, 691 [3d Dept 2004]). A surety is generally "obligated to comply regardless of the surety's belief as to what occurred or caused the claim of default" and "[a]s long as the surety acts in good faith in assuming the remaining contractual obligations and pay construction expenses accordingly, whether the contractor actually defaulted will neither affect the surety's right to be indemnified for expenses paid nor defeat the surety's motion for summary judgment" (First Nat. Ins. Co. of Am. v Joseph R. Wunderlich, Inc., 358 F Supp 2d 44, 52 [ND NY 2004], affd 144 Fed Appx 125 [2d Cir 2005]; see Glen Banks, New York Contract Law § 25:31 [28A West's NY Prac Series, July 2024 update]). Here, Travelers proceeded with its obligations on the performance bond and entered into a takeover agreement with OGS with a full reservation of any rights that have or would accrue to, among others, MBC (see First Nat. Ins. Co. of Am. v Joseph R. Wunderlich, Inc., 358 F Supp 2d at 52; Frontier Ins. Co. v Renewal Arts Contr. Corp., 12 AD3d 891, 893 [3d Dept 2004]; cf. Lee v T.F. v DeMilo Corp., 29 AD3d 867, 868 [2d Dept 2006]; see generally 5 Bruner & O'Connor on Construction Law § 12:78 [Nov. 2024 update]). We discern no issue of material fact with respect to Classic's claim. Accordingly, Supreme Court properly dismissed its motion on such grounds.
Classic next [*9]asserts that Supreme Court erred in denying that part of its motion seeking to prevent the MBC defendants from asserting differing positions from those asserted in the Court of Claims action under the theory of judicial estoppel. We disagree. "[J]udicial estoppel provides that where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, it may not thereafter, simply because its interests have changed, assume a contrary position" (Northacker v County of Ulster, 212 AD3d 86, 91 [3d Dept 2022] [internal quotation marks and citations omitted]; see Pierce v Archer Daniels Midland, Co., 221 AD3d 1382, 1384 [3d Dept 2023]). We reject Classic's contention that the MBC defendants have succeeded or benefited from their position in the Court of Claims action. Although the legal position at issue need not be "ruled upon in the context of a judgment," (12 New St., LLC v National Wine & Spirits, Inc., 196 AD3d 883, 886 [3d Dept 2021] [internal quotation marks and citations omitted]), "there must be a final determination endorsing the party's inconsistent position in the prior proceeding" (Stefanik v Hochul, 229 AD3d 79, 93 [3d Dept 2024] [internal quotation marks and citations omitted], affd 43 NY3d 49 [2024]; see Northacker v County of Ulster, 212 AD3d at 91). In this case, the resolution of OGS's liability to the MBC defendants remains pending in the Court of Claims, and we discern no benefit that has flowed from the mere commencement of that proceeding (see Stefanik v Hochul, 229 AD3d at 93; Borrelli v Thomas, 195 AD3d 1491, 1494-1495 [4th Dept 2021]; compare Walker v GlaxoSmithKline, LLC, 201 AD3d 1272, 1276 [3d Dept 2022]).[FN7]
Classic's remaining contention that dismissal was warranted based upon the MBC defendants' purported failure to oppose Classic's motion with an affidavit of a party with personal knowledge of the underlying matter is also without merit. Classic failed to meet its burden with respect to any of its proffered grounds for summary judgment and, had they done so, there is no indication from the terse reference in Classic's reply as to what specific argument Classic was arguing was unsupported in MBC's opposition papers. In any event, our review of the record establishes that the MBC defendants' opposition was supported by the affidavit of Hogel, submitted in support of the MBC defendants' motion for summary judgment, along with other documentary evidence specific to each of Classic's contentions (see Movimiento Misionero Mundial, Inc. v SoBRO Dev. Corp., 238 AD3d 607, 608 [1st Dept 2025]; compare McGarvey v Eldred Cent. Sch. Dist., 221 AD3d 1114, 1117 [3d Dept 2023]).
Garry, P.J., Aarons, Fisher and Mackey, JJ., concur.
ORDERED that the order is affirmed, with one bill of costs.

Footnotes

Footnote 1: Although each of the MBC defendants are included in the motion for summary judgment, we note that the two individual MBC defendants are not named parties in action No. 1 and took no part in the associated third-party complaint in said action.

Footnote 2: In opposition to the MBC defendants' motion, Classic also argued, and Supreme Court rejected, that MBC had materially breached the subcontract prior to the lead incident. Classic has not raised that contention on appeal, rendering it abandoned (see JMMJ Dev., LLC v Woodvale Holdings, LLC, 207 AD3d 830, 831 n [3d Dept 2022]).
Footnote 3: Indeed, Supreme Court denied that part of the MBC defendants' motion seeking partial summary judgment based upon its position that Classic's failure to adhere to the subcontract caused OGS to cancel the prime contract, as the issue was central to MBC's action against OGS that remained pending before the Court of Claims.
Footnote 4: OGS also noted that, despite maintaining reservations about Classic's "integrity and past performance," it would deem them responsible for that project only, noting that the scope and magnitude was far different than the project that underlies this proceeding.

Footnote 5: Classic also contends that Supreme Court's finding of material breach is inconsistent with that part of the court's determination permitting SCE's claim for breach of contract to proceed to trial. We reject that assertion, as the facts underlying the asserted breaches rely on entirely different sets of facts.

Footnote 6: Classic also contends that Supreme Court improperly dismissed its second cause of action purporting to seek relief pursuant to CPLR 3016 (f). That provision allows a party seeking to recover damages based upon performance of service or labor, to itemize its claims and assert a "reasonable value or agreed price of each," which then requires the answering party to "indicate specifically those items [it] disputes and whether in respect of delivery or performance, reasonable value or agreed price" (CPLR 3016 [f]). As Supreme Court properly dismissed the causes of action for breach of contract and an account stated, it also properly dismissed Classic's computation of damages for those claims, which Classic improperly designated as a separate cause of action (see 11th St. Assoc. LLC v City of New York, 192 AD3d 412, 413-414 [1st Dept 2021]; Ryan Graphics, Inc. v Bailin, 39 AD3d 249, 251 [1st Dept 2007]).

Footnote 7: We note that during the pendency of this appeal and after the submission of the parties' briefs, the Court of Claims rendered a determination that, among other things, denied MBC and Traveler's motion for summary judgment. The matter remains pending.